# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | SECOND SUPERSEDING |
| | : | |
| v. | : | |
| | : | |
| DAVID CHRISTOPHER REDFERN | : | 1:20CR340-1 |
| JOSEPH MARSELL CARTLIDGE | : | 1:20CR340-2 |
| ERIC ALEXANDER MCMILLER | : | 1:20CR340-3 |
| JESSE KENDALL GRIFFIN | : | 1:20CR340-4 |



The Grand Jury charges:

## **General Allegations**

At all times material to this Second Superseding Indictment:

### *The Defendants and Related Entities and Individuals*

1.    The defendant, DAVID CHRISTOPHER REDFERN, was a resident of Trinity, North Carolina, in the Middle District of North Carolina.

2.    REDFERN was the registered agent and owner of Wilder Effects LLC ("Wilder Effects"), a company that was registered with the North Carolina Secretary of State on or about January 17, 2020.  The registered business address for Wilder Effects was REDFERN's residential address ("Trinity Address").

3.    The defendant, JOSEPH MARSELL CARTLIDGE, was a resident of Greensboro, North Carolina, in the Middle District of North Carolina.

4.     CARTLIDGE was the registered agent and owner of LBRNO LLC ("LBRNO"), a company that was registered with the North Carolina Secretary of State on or about December 29, 2016.  The registered business address for LBRNO was an office building in Charlotte, North Carolina.

5.     The defendant, ERIC ALEXANDER MCMILLER, was a resident of Greensboro, North Carolina, in the Middle District of North Carolina.

6.     MCMILLER was the registered agent and owner of McMiller Enterprises LLC ("McMiller Enterprises"), a company that was registered with the North Carolina Secretary of State on or about February 25, 2020.  The registered business address for McMiller Enterprises was a residential address in Greensboro, North Carolina.

7.     The defendant, JESSE KENDALL GRIFFIN, was a resident of High Point, North Carolina, in the Middle District of North Carolina.

8.     GRIFFIN was the registered agent and owner of JJ & JJ Construction Service LLC ("JJ Construction"), a company that was registered with the North Carolina Secretary of State on or about January 21, 2020.  The registered business address for JJ Construction was the Trinity Address.

9.     Individual 1 was the registered agent and owner of Company 1, a company that was registered with the North Carolina Secretary of State on or about January 13, 2020.  From in or around February 2020 through all

2

subsequent dates material to this Second Superseding Indictment, Individual 1 was incarcerated in correctional facilities in North Carolina.

10.    CHS 1 was a resident of Hollywood, Florida, in the Southern District of Florida.

### *The Small Business Administration and the CARES Act*

11.    The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

12.    As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders that had government-backed guarantees.  The SBA also provided direct loans.

13.    In or around March 2020, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was enacted to provide emergency financial assistance to the millions of Americans suffering negative economic effects caused by the COVID-19 pandemic.  The CARES Act established several new programs and provided for expansion of others, including programs created and/or administered by the SBA.

3

## The Paycheck Protection Program

14.     One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").  In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

15.     In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) was required to state, among other things, its: (i) average monthly payroll expenses; and (ii) number of employees.  These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.  In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

16.     A PPP loan application was required to be processed by a participating lender.  If a PPP loan application was approved, the lender funded the PPP loan using its own moneys, which were 100% guaranteed by

4

the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

17.     PPP loan proceeds were required to be used by the business on certain permissible expenses: payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time after receiving the proceeds and used a certain amount of the PPP loan proceeds on payroll expenses.

### The Economic Injury Disaster Loan Program

18.     The Economic Injury Disaster Loan ("EIDL") program was an SBA program that provided low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

19.     The CARES Act authorized the SBA to provide EIDLs to eligible small businesses experiencing substantial financial disruptions due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses. The amount of the advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid.

5

20.    In order to obtain an EIDL and advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenue for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020.  The applicant was also required to certify that all of the information in the application was true and correct to the best of the applicant's knowledge.

21.    EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor, Rapid Finance.   The amount of the loan, if the application was approved, was determined based, in part, on the information provided in the application concerning the number of employees, gross revenue, and cost of goods, as described above.  Any funds issued under an EIDL or advance were issued directly by the SBA.   EIDL funds were permitted to be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.  If the applicant also obtained a loan under the PPP, the EIDL funds were not permitted to be used for the same purpose as the PPP funds.

6

*Relevant Financial Institutions and Related Entities*

22. Financial Institution 1 was a federally insured financial institution based in Utah. Financial Institution 1 was an SBA Preferred Lender and participated as a PPP lender to small businesses.

23. FinTech 1 was a financial technology company based in California. FinTech 1 participated in the SBA's PPP by, among other things, acting as a service provider between small businesses and certain lenders, including Financial Institution 1. Small businesses seeking PPP loans could apply through FinTech 1 for PPP loans. FinTech 1 would review the loan applications. If a loan application received by FinTech 1 was approved for funding, a partner lender, such as Financial Institution 1, disbursed the loan funds to the applicant.

24. Financial Institution 2 was a federally insured financial institution based in California with branches throughout the United States.

25. Financial Institution 3 was a federally insured financial institution based in North Carolina with branches throughout the United States.

   a. On or about January 14, 2020, CARTLIDGE opened a business account in Company 1's name at Financial Institution 3

7

("Company 1 Account"), with Individual 1 as the purported authorized signer.

b. On or about January 23, 2020, REDFERN opened a business account in Wilder Effects' name at Financial Institution 3 ("Wilder Effects Account 1"), over which REDFERN had sole signatory authority.

26. Financial Institution 4 was a federally insured financial institution based in Texas with branches throughout the United States.

a. On or about January 13, 2020, CARTLIDGE opened an account in LBRNO's name at Financial Institution 4 ("LBRNO Account"), over which CARTLIDGE had sole signatory authority.

b. On or about June 2, 2020, REDFERN opened a business account in Wilder Effects' name at Financial Institution 4 ("Wilder Effects Account 2"), over which REDFERN had sole signatory authority.

27. Financial Institution 5 was a federally insured financial institution based in North Carolina with branches in North and South Carolina. On or about May 6, 2020, MCMILLER opened an account in

8

McMiller Enterprises' name at Financial Institution 5 ("McMiller Enterprises Account"), over which MCMILLER had sole signatory authority.

28.     Financial Institution 6 was a federally insured financial institution based in New York with branches throughout the United States. On or about June 23, 2020, MCMILLER opened an account in his name at Financial Institution 6 ("McMiller Account"), over which MCMILLER had sole signatory authority.

29.     Financial Institution 7 was a federally insured credit union based in Virginia with branches throughout the United States. On or about January 27, 2020, GRIFFIN opened an account in JJ Construction's name at Financial Institution 7 ("JJ Construction Account"), over which GRIFFIN had sole signatory authority.

## The PPP Conspiracy and Scheme to Defraud

30.     REDFERN, CARTLIDGE, MCMILLER, GRIFFIN, and others known and unknown to the Grand Jurors, devised a scheme to defraud by submitting and causing to be submitted false and fraudulent loan applications to Financial Institution 1 and FinTech 1 in order to obtain funds through the PPP.

9

## Purpose of the PPP Conspiracy and Scheme to Defraud

31.    It was the purpose of the PPP scheme to defraud for REDFERN, CARTLIDGE, MCMILLER, and GRIFFIN to unjustly enrich themselves and others by obtaining loan proceeds authorized by the CARES Act under false and fraudulent pretenses, including by making false statements about the number of employees and the intended use of the loan proceeds for each company and by providing false documentation.

## Manner and Means of the PPP Conspiracy and Scheme to Defraud

32.    CHS 1 used intermediaries to recruit individuals to apply for false and fraudulent PPP loans and, in return for preparing PPP loan application documentation for such individuals, sought a portion of the fraudulently obtained loan proceeds.    REDFERN, CARTLIDGE, MCMILLER, and GRIFFIN communicated with CHS 1 through one or more intermediaries and agreed to participate in the scheme and conspiracy.

33.    REDFERN, CARTLIDGE, MCMILLER, and GRIFFIN utilized recently registered businesses and claimed false business operations in the fraud scheme.    Wilder Effects, Company 1, and JJ Construction were registered in or around January 2020, and McMiller Enterprises was registered in or around February 2020.

10

34.    REDFERN, CARTLIDGE, MCMILLER, and GRIFFIN utilized or attempted to utilize business bank accounts at Financial Institutions 3, 4, 5, and 7 that were opened between in or around January 2020 through in or around June 2020 for the purpose of, among other things, receiving fraudulent loan proceeds.

35.    REDFERN, CARTLIDGE, MCMILLER, and GRIFFIN provided personal and entity identifying information to CHS 1 through one or more intermediaries in order to seek PPP loans.  CHS 1 used such information to prepare and cause to be prepared false and fraudulent supporting documentation, including bank account statements and tax filings, for PPP applications in the names of Wilder Effects, LBRNO, Company 1, McMiller Enterprises, and JJ Construction.  The false and fraudulent bank account statements submitted in connection with PPP applications in the names of Wilder Effects, LBRNO, Company 1, McMiller Enterprises, and JJ Construction were identical except for account identifying information listed on the first page of each eight-page statement.

***PPP Applications Submitted to FinTech 1 and Financial Institution 1***

36.    Between on or about May 31, 2020, and on or about June 3, 2020, REDFERN, CARTLIDGE, MCMILLER, and GRIFFIN submitted and caused the submission of false and fraudulent PPP loan applications.  Specifically:

11

37.     On or about May 31, 2020, GRIFFIN caused an electronic PPP application in the name of JJ Construction to be sent to FinTech 1 ("JJ Construction PPP Application").    The JJ Construction PPP Application requested at least $465,902.85 to support JJ Construction's purported payroll. In the JJ Construction PPP Application, GRIFFIN falsely affirmed or caused to be affirmed, among other information, that: (i) he was the sole owner of JJ Construction; and (ii) JJ Construction had twenty-two employees and an average monthly payroll of $182,707.    The JJ Construction PPP Application was denied by letter dated June 4, 2020.

38.     The JJ Construction PPP Application appended as supporting documentation: (i) false and fraudulent purported IRS Forms 941 (Employer's Quarterly Federal Tax Return) for all four quarters of 2019 showing $548,123.79 paid in wages to twenty-two employees per quarter; and (ii) a false and fraudulent Financial Institution 2 bank statement for JJ Construction dated February 27, 2020, showing a balance of $290,028.70.

39.     On or about June 11, 2020, GRIFFIN emailed FinTech 1 inquiring as to "what information . . . to send" to have the JJ Construction PPP Application "reviewed again because [he is] in dire need of this loan to keep [his] business operational."    On or about June 16, 2020, GRIFFIN sent a second email again inquiring as to information needed for reconsideration.

12

40. On or about June 1, 2020, REDFERN caused an electronic PPP application in the name of Wilder Effects to be sent to FinTech 1 ("Wilder Effects PPP Application"). The Wilder Effects PPP Application requested a loan in the amount of $410,322. In the Wilder Effects PPP Application, REDFERN falsely affirmed or caused to be falsely affirmed, among other information, that: (i) he was the sole owner of Wilder Effects; and (ii) Wilder Effects had twenty employees and an average monthly payroll of $164,129.

41. The Wilder Effects PPP Application appended as supporting documentation: (i) a false and fraudulent purported IRS Form 941 for the first quarter of 2020 showing $492,389.01 paid in wages to twenty employees; and (ii) a false and fraudulent Financial Institution 2 bank statement for Wilder Effects dated February 27, 2020, showing a balance of $290,028.70.

42. On or about June 1, 2020, CARTLIDGE caused an application in the name of Company 1 to be sent to FinTech 1 ("Company 1 PPP Application"). The Company 1 PPP Application requested a loan in the amount of $403,120. CARTLIDGE provided the name and other personal identifying information of Individual 1 to complete the Company 1 PPP Application.

43. The Company 1 PPP Application appended as supporting documentation: (i) a false and fraudulent purported IRS Form 941 for the first quarter of 2020 showing $483,746.04 paid in wages to twenty-four employees

13

and purportedly signed by Individual 1; and (ii) a false and fraudulent Financial Institution 2 bank account statement for Company 1 dated February 27, 2020, showing a balance of $290,028.70.

44. On or about June 2, 2020, CARTLIDGE caused an application in the name of LBRNO to be sent to FinTech 1 ("LBRNO PPP Application"). The LBRNO PPP Application requested a loan in the amount of $463,530. In the LBRNO PPP Application, CARTLIDGE falsely affirmed or caused to be falsely affirmed, among other information, that: (i) he was the sole owner of LBRNO; and (ii) LBRNO had twenty-three employees and an average monthly payroll of $185,412.

45. The LBRNO PPP Application appended as supporting documentation: (i) false and fraudulent purported IRS Forms 941 for all four quarters of 2019 showing $556,237.44 paid in wages to twenty-three employees per quarter; and (ii) a false and fraudulent Financial Institution 2 bank statement for LBRNO dated February 27, 2020, showing a balance of $290,028.70.

46. On or about June 3, 2020, MCMILLER caused an electronic PPP application in the name of McMiller Enterprises to be sent to FinTech 1 ("McMiller Enterprises PPP Application"). The McMiller Enterprises PPP Application requested at least $584,000 to support McMiller Enterprises'

14

purported payroll. In the McMiller Enterprises PPP Application, MCMILLER falsely affirmed or caused to be affirmed, among other information, that: (i) he was the sole owner of McMiller Enterprises; and (ii) McMiller Enterprises had twenty-seven employees and an average monthly payroll of $229,144. The McMiller Enterprises PPP Application was denied by letter dated June 5, 2020.

47. The McMiller Enterprises PPP Application appended as supporting documentation: (i) false and fraudulent purported IRS Forms 941 for all four quarters of 2019 showing $687,432.60 paid in wages to twenty-seven employees per quarter; and (ii) a false and fraudulent Financial Institution 2 bank statement for McMiller Enterprises dated February 27, 2020, showing a balance of $290,028.70.

48. On or about June 11, 2020, MCMILLER emailed FinTech 1 to "clear up any problems" in connection with the denied McMiller Enterprises PPP Application.

### *PPP Loan Proceeds*

49. After FinTech 1 and Financial Institution 1 approved certain of the PPP loans, REDFERN and CARTLIDGE transferred, caused to be transferred, and attempted to transfer fraudulently obtained PPP loan proceeds to accounts under their and their co-conspirators' control, and used PPP loan proceeds for their personal benefit, and for the benefit of others.

15

50.     On or about June 2, 2020, $410,322 in PPP funds were deposited into Wilder Effects Account 1, controlled by REDFERN.

     a. On or about June 2, 2020, an attempt was made to wire $102,580 from Wilder Effects Account 1 to an account in Florida controlled by CHS 1.

     b. On or about June 2, 2020, an attempt was made to wire $30,000 from Wilder Effects Account 1 to the JJ Construction Account, controlled by GRIFFIN.

     c. On or about June 3, 2020, an $8,000 counter check written to "cash" was withdrawn from Wilder Effects Account 1.

51.     On or about June 2, 2020, $403,120 in PPP funds were deposited into the Company 1 Account.

     a. On or about June 3, 2020, an attempt was made to wire $75,000 from the Company 1 Account to the JJ Construction Account, controlled by GRIFFIN.

     b. On or about June 3, 2020, an attempt was made to wire $75,000 from the Company 1 Account to Wilder Effects Account 1, controlled by REDFERN.

     c. On or about June 10, 2020, MCMILLER attempted to deposit a $250,000 check drawn from the Company 1 Account and

16

purportedly signed by Individual 1 into the McMiller Enterprises Account, controlled by MCMILLER. On or about June 12, 2020, a $250,000 chargeback posted to the McMiller Enterprises Account.

52.　On or about June 3, 2020, $463,530 in PPP funds were deposited into the LBRNO Account, controlled by CARTLIDGE.

    a. Between on or about June 3, 2020 and on or about June 19, 2020, approximately $454,000 was withdrawn via cash and cashier's check from the LBRNO Account.

    b. On or about June 18, 2020, a $649 debit card purchase was made at Louis Vuitton in Northbrook, Illinois.

    c. On or about June 19, 2020, a $979 debit card purchase was made at Neiman Marcus in Northbrook, Illinois.

    d. On or about June 20, 2020, a $1,526.33 debit card purchase was made at Gucci in Dallas, Texas.

    e. On or about June 30, 2020, a $2,350 debit card purchase was made at Get My Boat, a boat and yacht rental company.

### The EIDL Scheme to Defraud

53.　REDFERN, CARTLIDGE, MCMILLER, GRIFFIN, and others known and unknown to the Grand Jurors, devised a scheme to defraud by

17

submitting and causing to be submitted false and fraudulent loan applications to the SBA in order to obtain funds through the EIDL program.

## Purpose of the EIDL Schemes to Defraud

54. It was the purpose of the EIDL scheme to defraud for REDFERN, CARTLIDGE, MCMILLER, and GRIFFIN respectively to unjustly enrich himself and others by obtaining EIDL proceeds under false and fraudulent pretenses, including by making false statements about the number of employees, the gross revenues, and the cost of goods sold for their respective companies.

## Manner and Means of the EIDL Scheme to Defraud

55. REDFERN, CARTLIDGE, MCMILLER, and GRIFFIN utilized recently registered businesses and claimed false business operations in connection with the submission of false and fraudulent EIDL applications to the SBA. REDFERN, CARTLIDGE, MCMILLER, and GRIFFIN utilized or attempted to utilize bank accounts at Financial Institutions 3, 4, 6, and 7 that were opened between in or around January 2020 through in or around June 2020 for the purpose of, among other things, receiving fraudulent loan proceeds.

18

*EIDL Applications Submitted to the SBA*

56.    On or about March 31, 2020, CARTLIDGE applied electronically for an EIDL from the SBA ("EIDL Application -2386") in the name of LBRNO. In connection with EIDL Application -2386, CARTLIDGE falsely affirmed, among other information, that LBRNO had seven employees and in the twelve months prior to the disaster had $148,000 in gross revenues and $87,000 in cost of goods sold.  EIDL Application -2386 was subsequently denied.

57.    On or about April 11, 2020, CARTLIDGE applied electronically for an EIDL from the SBA ("EIDL Application -5320") in the name of Company 1, listing Individual 1's personal information.   In connection with EIDL Application -5320, CARTLIDGE falsely affirmed, among other information, that Company 1 had fourteen employees and in the twelve months prior to the disaster had $144,000 in gross revenues and $80,000 in cost of goods sold.  The bank account number and routing number submitted in connection with EIDL Application -5320 corresponded to the LBRNO Account, although Company 1's name was listed as the "Name on Account."  EIDL Application -5320 was subsequently denied.

58.    On or about April 12, 2020, REDFERN applied electronically for an EIDL from the SBA ("EIDL Application -4729") in the name of Wilder Effects.   In connection with EIDL Application -4729, REDFERN falsely

19

affirmed, among other information, that Wilder Effects had two employees, had suffered $3,000 in rental losses due to the disaster, and in the twelve months prior to the disaster had $21,000 in gross revenues and $13,000 in cost of goods sold. On or about June 16, 2020, EIDL Application -4729 was approved for an EIDL ("EIDL Loan -7904") in the amount of $2,000.

59. On or about April 12, 2020, GRIFFIN applied electronically for an EIDL from the SBA ("EIDL Application -3580") in the name of JJ Construction. In connection with EIDL Application -3580, GRIFFIN falsely affirmed, among other information, that JJ Construction had three employees, had suffered $3,000 in rental losses due to the disaster, and in the twelve months prior to the disaster had $18,000 in gross revenues and $11,000 in cost of goods sold. On or about May 4, 2020, a $3,000 EIDL advance was approved by the SBA. EIDL Application -3580 was subsequently denied.

60. On or about May 17, 2020, REDFERN applied electronically for an EIDL from the SBA ("EIDL Application -4452") in the name of Wilder Effects. In connection with EIDL Application -4452, REDFERN falsely affirmed, among other information, that Wilder Effects had nine employees, and in the twelve months prior to the disaster had $30,000 in gross revenues and $27,500 in cost of goods sold. EIDL Application -4452 was subsequently denied.

20

61.     On or about May 17, 2020, GRIFFIN applied electronically for an EIDL from the SBA ("EIDL Application -4424") in the name of JJ Construction. In connection with EIDL Application -4424, GRIFFIN falsely affirmed, among other information, that JJ Construction had nine employees, had suffered $13,500 in rental losses due to the disaster, and in the twelve months prior to the disaster had $30,000 in gross revenues and $15,000 in cost of goods sold. EIDL Application -4424 was subsequently denied.

62.     On or about June 16, 2020, MCMILLER applied electronically for an EIDL from the SBA ("EIDL Application -1277") in the name of McMiller Enterprises. In connection with EIDL Application -1277, MCMILLER falsely affirmed, among other information, that McMiller Enterprises had ten employees, had suffered $9,428 in rental losses due to the disaster, and in the twelve months prior to the disaster had $140,000 in gross revenues and $345,000 in cost of goods sold. That same day, a $10,000 EIDL advance was approved by the SBA. EIDL Application -1277 listed the "business open date" as February 13, 2020. EIDL Application -1277 was subsequently denied due to verification that the entity formation date post-dated the disaster date.

63.     On or about June 18, 2020, GRIFFIN applied electronically for an EIDL from the SBA ("EIDL Application -3472") in the name of a "Jesse Griffin" sole proprietorship. The application listed an email address associated with

21

JJ Construction as the primary email address. In connection with EIDL Application -3472, GRIFFIN falsely affirmed, among other information, that GRIFFIN's purported sole proprietorship had ten employees and in the twelve months prior to the disaster had $98,456 in gross revenues and $84,567 in cost of goods sold. EIDL Application -3472 was subsequently denied.

64. On or about June 29, 2020, MCMILLER applied electronically for an EIDL from the SBA ("EIDL Application -4708) in the name of an "Eric mcmiller" sole proprietorship. In connection with EIDL Application -4708, MCMILLER falsely affirmed, among other information, that the sole proprietorship had ten employees, and in the twelve months prior to the disaster had $98,232 in gross revenues and $84,230 in cost of goods sold. That same day, a $10,000 EIDL advance was approved by the SBA. EIDL Application -4708 listed the "business open date" as February 13, 2015. EIDL Application -4708 was subsequently denied for failure to substantiate economic injury.

65. On or about July 15, 2020, GRIFFIN applied electronically for an EIDL from the SBA ('EIDL Application -3607) in the name of JJ Construction. In connection with EIDL Application -3607, GRIFFIN falsely affirmed, among other information, that JJ Construction had ten employees, had suffered $7,200 in rental losses due to the disaster, and in the twelve months prior to

22

the disaster had $45,000 in gross revenues and $25,000 in cost of goods sold. EIDL Application -3607 was subsequently denied.

66.   On or about August 14, 2020, MCMILLER applied electronically for an EIDL from the SBA ("EIDL Application -1854") in the name of an "Eric mcmiller" sole proprietorship. In connection with EIDL Application -1854, MCMILLER falsely affirmed, among other information, that the sole proprietorship had ten employees, and in the twelve months prior to the disaster had $98,345 in gross revenues and $82,321 in cost of goods sold. EIDL Application -1854 listed the "business open date" as April 12, 2015. EIDL Application -1854 was subsequently flagged as a duplicate application.

67.   On or about December 28, 2020, GRIFFIN applied electronically for an EIDL from the SBA ("EIDL Application -9240") in the name of JJ Construction. In connection with EIDL Application -9240, GRIFFIN affirmed, among other information, that JJ Construction had three employees, had suffered $3,000 in rental losses due to the disaster, and in the twelve months prior to the disaster had $42,000 in gross revenues and $12,000 in cost of goods sold. EIDL Application -9240 was subsequently denied.

### EIDL Proceeds

68.   On or about May 5, 2020, $2,000 in EIDL advance funds were deposited into Wilder Effects Account 1.

23

69. On or about May 5, 2020, $3,000 in EIDL advance funds were deposited into the JJ Construction Account.

70. On or about June 18, 2020, $10,000 in EIDL advance funds were deposited into the LBRNO Account, in connection with EIDL Application -1277 for McMiller Enterprises.

71. On or about June 18, 2020, $2,000 in EIDL funds in connection with EIDL Loan -7904 were deposited into Wilder Effects Account 2.

72. On or about June 30, 2020, $10,000 in EIDL advance funds were deposited into the McMiller Account, in connection with EIDL Application -4708 for the sole proprietorship.

## COUNT ONE
### (Wire Fraud Conspiracy – PPP Scheme)

73. Paragraphs 1 through 52 of the General Allegations section of this Second Superseding Indictment are incorporated by reference as if fully set forth herein.

74. From at least in or around May 2020, continuing up to and including in or around June 2020, the exact dates to the Grand Jurors unknown, in the Counties of Guilford and Randolph, in the Middle District of North Carolina, and elsewhere, DAVID CHRISTOPHER REDFERN, JOSEPH MARSELL CARTLIDGE, ERIC ALEXANDER MCMILLER, and JESSE

24

KENDALL GRIFFIN, with others known and unknown to the Grand Jurors, did knowingly and intentionally, that is, with the intent to advance the conspiracy, combine, conspire, confederate, and agree with each other and others, both known and unknown to the Grand Jurors, to commit wire fraud, that is, having knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH SIX
### (Wire Fraud – PPP Scheme)

75.     Paragraphs 1 through 52 of the General Allegations section of this Second Superseding Indictment are incorporated by reference as if fully set forth herein.

76.     On or about the dates specified as to each count below, in the Counties of Guilford and Randolph, in the Middle District of North Carolina, and elsewhere, DAVID CHRISTOPHER REDFERN, JOSEPH MARSELL CARTLIDGE, ERIC ALEXANDER MCMILLER, and JESSE KENDALL

25

GRIFFIN having knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, as set forth below:

| Count | Defendant | Approximate Date | Description |
|-------|-----------|------------------|-------------|
| 2 | REDFERN | June 2, 2020 | Wire transfer of $410,322 that Financial Institution 1, in Utah, caused to be routed in interstate commerce to Wilder Effects Account 1 at Financial Institution 3 in North Carolina. |
| 3 | CARTLIDGE | June 2, 2020 | Wire transfer of $403,120 that Financial Institution 1, in Utah, caused to be routed in interstate commerce to the Company 1 Account at Financial Institution 3 in North Carolina. |
| 4 | CARTLIDGE | June 3, 2020 | Wire transfer of $463,530 that Financial Institution 1, in Utah, caused to be routed in interstate commerce to the LBRNO Account at Financial Institution 4 in North Carolina. |

26

| 5 | MCMILLER | June 11, 2020 | Email sent by MCMILLER to FinTech1 in connection with the McMiller Enterprises PPP Application. |
| 6 | GRIFFIN | June 11, 2020 | Email sent by GRIFFIN to FinTech 1 in connection with the JJ Construction PPP Application. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS SEVEN THROUGH ELEVEN
### (Wire Fraud – EIDL Scheme)

77.    Paragraphs 1 through 29 and 53 through 72 of the General Allegations section of this Second Superseding Indictment are incorporated by reference as if fully set forth herein.

78.    On or about the dates specified as to each count below, in the Counties of Guilford and Randolph, in the Middle District of North Carolina, and elsewhere, DAVID CHRISTOPHER REDFERN, ERIC ALEXANDER MCMILLER, and JESSE KENDALL GRIFFIN, having knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate commerce, writings, signs,

27

signals, pictures, and sounds for the purpose of executing such scheme and artifice, as set forth below:

| Count | Defendant | Approximate Date | Description |
|-------|-----------|------------------|-------------|
| 7 | REDFERN | May 5, 2020 | Wire transfer of $2,000 that the SBA, in Colorado, caused to be routed in interstate commerce to Wilder Effects Account 1 at Financial Institution 3 in North Carolina. |
| 8 | GRIFFIN | May 5, 2020 | Wire transfer of $3,000 that the SBA, in Colorado, caused to be routed in interstate commerce to the JJ Construction account at Financial Institution 7 in North Carolina. |
| 9 | REDFERN | June 18, 2020 | Wire transfer of $2,000 that the SBA, in Colorado, caused to be routed in interstate commerce to Wilder Effects Account 2 at Financial Institution 4 in North Carolina. |
| 10 | MCMILLER | June 18, 2020 | Wire transfer of $10,000 that the SBA, in Colorado, caused to be routed in interstate commerce to the LRBRNO Account at Financial Institution 4 in North Carolina. |
| 11 | MCMILLER | June 30, 2020 | Wire transfer of $10,000 that the SBA, in Colorado, caused to be routed in interstate commerce to the McMiller Account at Financial Institution 6 in North Carolina. |

28

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT TWELVE
### (Bank Fraud)

79.     Paragraphs 1 through 52 of the General Allegations section of this Second Superseding Indictment are incorporated by reference as if fully set forth herein.

80.     In or around June 2020, the exact dates to the Grand Jurors unknown, in the Counties of Guilford and Randolph, in the Middle District of North Carolina, and elsewhere, DAVID CHRISTOPHER REDFERN and JOSEPH MARSELL CARTLIDGE knowingly executed and attempted to execute a scheme and artifice to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody or control of, a financial institution, to wit, Financial Institution 1, by means of false and fraudulent pretenses, representations, and promises.

All in violation of Title 18, United States Code, Sections 1344(2) and 2.

## FORFEITURE ALLEGATION

81.     The allegations contained in this Second Superseding Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2), and Title 28, United States Code, Section 2461(c).

82.     Upon conviction of one or more of the offenses set forth in Counts One through Twelve of this Second Superseding Indictment, the defendants, DAVID CHRISTOPHER REDFERN, JOSEPH MARSELL CARTLIDGE, ERIC ALEXANDER MCMILLER, and JESSE KENDALL GRIFFIN shall forfeit to the United States any property, real or personal, constituting, or derived from, proceeds traceable to or obtained directly or indirectly, as the result of such violation. Such forfeitable property may include a money judgment in an amount to be determined, representing the value of the property subject to forfeiture as a result of such offense.

83.     If any of the property described above as being subject to forfeiture as a result of any act or omission of the defendants cannot be located upon the exercise of due diligence, has been transferred or sold to or deposited with a third person, has been placed beyond the jurisdiction of the Court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

30

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and

982(a)(2), Rule 32.2, Federal Rules of Criminal Procedure, and Title 28, United

States Code, Section 2461(c).

DATED:  April 26, 2021

SANDRA J. HAIRSTON
Acting United States Attorney

BY: MEREDITH C. RUGGLES
Assistant United States Attorney

DANIEL S. KAHN
Acting Chief, Fraud Section
United States Department of Justice
Criminal Division

BY: JESSEE ALEXANDER-HOEPPNER
Trial Attorney, Fraud Section

A TRUE BILL

FOREPERSON

31